**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JAMES SCHELLHASE<br><br>Plaintiff,<br><br>v.<br><br>UNITEDLEX CORPORATION,<br>CVC CAPITAL PARTNERS,<br>TITAN INVESTMENT HOLDING, L.P.,<br>and REPARIO DATA, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.<br><br>**JURY TRIAL DEMANDED** |

The Plaintiff, James Schellhase ("Plaintiff" or "Schellhase"), for his Complaint against Defendant UnitedLex Corporation ("UnitedLex"), Defendant CVC Capital Partners ("CVC"), Defendant Titan Investment Holding L.P. ("Titan Investment"), and Defendant Repario Data, LLC ("Repario") collectively "Defendants," avers and states as follows:

**PARTIES**

1. Plaintiff James Schellhase is an individual and a resident of Austin, Texas.

2. Defendant UnitedLex Corporation is a Delaware for-profit corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Kansas.

3. Defendant CVC is a private equity and investment advisory corporation, organized and existing under the laws of Jersey, with its principal place of business in St Helier, Jersey.

4. Defendant Titan Investment Holding L.P. is a Delaware limited partnership and a holding company operated by Defendant CVC.

5. Defendant Repario Data, LLC is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business in Kansas.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there exists complete diversity of citizenship between the Plaintiff and the Defendants. Plaintiff Schellhase lives in Texas and is therefore a citizen of Texas for purposes of determining diversity jurisdiction. No Defendants are citizens of Texas. The total amount in controversy resulting from Defendants' conduct well exceeds $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendants and venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendant UnitedLex is a Delaware corporation, because Defendant Titan Investment is a Delaware limited partnership, because Defendant Repario is a Delaware limited liability company, and because the Parties consented to Delaware as the "exclusive jurisdiction" via a forum selection clause in an Employment Agreement between Plaintiff and Defendants. (Exhibit A hereto).

## FACTS

### *Defendants' Ownership*

8. James Schellhase is a highly experienced and (previously[1]) well-respected executive who has successfully led several companies through transformation and exit strategies. He is a six-time Chief Executive Officer (CEO).

9. UnitedLex is a legal services company that provides technological services and traditional legal support to large corporate clients.

10. At all times relevant to this Complaint, CVC owned and operated UnitedLex through Titan Investment. While Titan Investment did not have any employees or operations, Titan

[1] As addressed below, UnitedLex's actions following Mr. Schellhase's termination tarnished his reputation to the point that he is currently unemployable.

Investment held UnitedLex stock and operated as a holding company for CVC. CVC owned substantially all of Titan Investment.

11. In the years leading up to 2023, UnitedLex lost several key clients and substantial revenues. CVC planned to sell UnitedLex, and in September 2023 UnitedLex recruited Plaintiff to serve as its CEO because of his experience guiding companies through successful and intentional ownership transfers. Specifically, UnitedLex hired Plaintiff to transform and optimize operations and recapture revenues to maximize the value of the company before the transfer.

12. On September 9, 2023, Plaintiff accepted the position as CEO with UnitedLex and signed an Employment Agreement. The Employment Agreement described his responsibilities and obligations to UnitedLex and Titan Investment in exchange for his employment and compensation, which included an award of equity.

13. Despite hiring Plaintiff as UnitedLex's CEO, CVC controlled UnitedLex through its "ULex Management Committee," ("the Committee") which made operational decisions through board representatives. Three CVC employees were on the Committee. The Committee controlled the basic business decisions of UnitedLex, often bypassing Plaintiff's authority as the CEO. For example, the Committee controlled whether Plaintiff could hire salespeople.

14. Members of the Committee had access to UnitedLex's Salesforce database, general ledger, and other operational systems.

15. Members of the Committee also held weekly one-on-one meetings with key members of UnitedLex's management team and directed their work.

16. CVC hired consultants who reported directly to and took guidance from CVC and had independent access to UnitedLex's systems. Those consultants generated reports exclusively for CVC.

17. CVC and Titan Investment, through the Committee, operated and controlled UnitedLex's operations and communications as described in this Complaint.

18. Upon information and belief, on or around September 28, 2026, Repario purchased UnitedLex from CVC and Titan Investment.

19. Upon information and belief, Repario assumed liability for all or part of the claims alleged in this Complaint.

***Plaintiff's Employment***

20. In consideration for accepting employment as CEO, Defendants promised to grant Plaintiff 12,450 units of equity, pay a base annual salary of $450,000, and provide other benefits including an annual bonus and severance upon separation.

21. Upon starting his new role, Plaintiff performed exceptionally. Throughout his employment, UnitedLex never raised any performance concerns, and Plaintiff led the company responsibly and diligently.

22. In fact, in his first year, because of his exceptional performance, UnitedLex paid Plaintiff a substantial annual bonus in excess of the pro rata cap contained in the Employment Agreement.

23. Although UnitedLex granted Plaintiff 12,450 units of equity in the Employment Agreement, UnitedLex refused to finalize a grant agreement. Plaintiff routinely asked the company to sign the grant agreement because the equity was a valuable piece of consideration for entering into the Employment Agreement.

24. However, UnitedLex delayed and failed to finalize the grant agreement.

25. In fact, UnitedLex's Chief Financial Officer (CFO) openly expressed concern to CVC that UnitedLex was purposely delaying finalizing the grant agreement. UnitedLex never signed the grant agreement.

***Plaintiff's Assault***

26. On September 28, 2024, during Plaintiff's employment with UnitedLex, Plaintiff was brutally attacked at an H-E-B grocery store in Texas while he was picking up supplies for an international business trip the following day.

27. Shortly after arriving at H-E-B, four men aggressively confronted Plaintiff with cameras. They crowded him and followed him around the store, bumping him and loudly yelling accusations at him in an effort to harass him and create a narrative for their video production.

28. The men tried to create a false narrative that Plaintiff was a pedophile and wanted to meet minor boys. They loudly and falsely accused Plaintiff of being a pedophile and claimed he was attempting to meet up with a minor. Those accusations, and subsequent assaults, were filmed.

29. The men tried to instigate Plaintiff by demanding that Plaintiff hit them. The men asked, "you want to hit us, don't you? Go ahead." This interaction escalated as the men invaded Plaintiff's personal space, taunted him, and chased him when he tried to get away.

30. A crowd gathered, including an H-E-B security employee who witnessed much of the interaction but failed to intervene. Plaintiff asked the men to stop following him several times and to get out of his face. H-E-B security cameras and phone cameras recorded the encounter.

31. After a couple of minutes, unprompted, one of the men, Jay Carnicom, punched Plaintiff in the jaw. Plaintiff's vision became blurry, and he felt a slight loss of consciousness. He was defenseless and did not fight back. Members of the group continued to film.

32. A couple of minutes later, another man, Kori Campbell smacked Plaintiff in the jaw with an open hand, further injuring Plaintiff's jaw.

33. Then a few moments later, Campbell quietly approached Plaintiff from behind, raised a large, hard pumpkin with two hands over his head, and slammed it down on the back of Plaintiff's head while another member of the group maneuvered Plaintiff into position in front of Campbell and the pumpkin display. Plaintiff fell face-first to the ground, unconscious. The men filmed this attack and continued to yell insults at Plaintiff.

34. After regaining consciousness a few moments later, Plaintiff was dizzy, nauseous, and could hardly see. Plaintiff stumbled away stunned and only semiconscious. H-E-B security provided no assistance.

35. Plaintiff's immediate physical injuries included severe jaw pain, difficulty moving his jaw, bruises on his back, concussion symptoms, dizziness and disorientation, and shoulder pain. His physical injuries took months to heal. Plaintiff still suffers from, and is under active treatment for, insomnia, depression, suicidal ideation, and PTSD because of the assault and from what ensued after.

36. Carnicom and Campbell were later identified and were criminally charged with engaging in organized criminal activity and felonious assault for their attack on Plaintiff.

***Defendants' Response to the Assault***

37. Despite his injuries, Plaintiff traveled to India with UnitedLex the morning after he was attacked due to commitments with clients and CVC board members.

38. On October 3, 2024, however, while working in India, UnitedLex locked Plaintiff out of the company network.

39. Plaintiff met with then-General Counsel Renee Meisel who informed him that the Board had received a video of him being assaulted and appearing intoxicated in a public place—a reference to an edited clip of the above-described DAP video recorded at the H-E-B grocery store. Plaintiff informed Meisel that he was not intoxicated but was wobbly after having just been knocked unconscious by an attacker.

40. Meisel informed Plaintiff that the Board was placing him on a 60-day paid leave of absence pending a thorough investigation into the video the Board had received.

41. Plaintiff then met virtually with two investigators from Treaty Oak, a third-party investigation company that UnitedLex hired to investigate the events.

42. The investigators informed Plaintiff that the Board received a brief, heavily-edited video recording without audio from a group called "Dads Against Predators" who appeared to be some type of vigilante group.

43. Having heard of this group for the first time, Plaintiff was completely open about the chain of events, including private personal information that was irrelevant to his role as CEO and to the provisions of his Employment Agreement.

44. Plaintiff explained that in the days leading up to the assault, two online social media profiles had led him into conversation. Both presented as adults and the exchanges proceeded on that basis.

45. After leading and sustaining the conversations, the user of one of the profiles subsequently claimed to be a minor. Plaintiff immediately declined any sexual contact and attempted to end the conversation.

46. The following day, the profile user continued to message Plaintiff and continued to request sexual activity. Plaintiff refused every time he was asked. Despite those refusals the profile

user persistently pursued a meeting in a public place. Suspecting that the profile user was scamming or pranking him, Plaintiff tested the profile's local knowledge. The user said he attended a high school Plaintiff knew did not exist, would not answer questions that could have shown the user's familiarity with the local area, and provided an unviable route to a specified location. Plaintiff concluded the user was not who he claimed to be.

47. The profile user asked to meet Plaintiff in person at an H-E-B, a public grocery store. Plaintiff was already planning to visit an H-E-B that evening to buy toiletries before an international flight the following morning. Plaintiff had concluded he was being scammed or pranked and was not dealing with a minor, though he did not know who was behind the profile. He agreed to meet, expecting that no one would appear, and wanting the matter resolved before he left the country for two weeks. While he was at H-E-B, Plaintiff was brutally attacked by people later discovered to be connected to the profiles of the two men with whom he had been chatting.

48. Plaintiff fully cooperated with the Treaty Oak investigation. The investigators said that the incident appeared to be a "setup" and specifically named three UnitedLex employees as potential individuals involved. The initial conference with the investigators lasted fewer than 30 minutes.

49. At the conclusion of the conference, the investigators stated they would follow-up with Plaintiff once he had returned to the United States. They did not.

50. Plaintiff then explained the circumstances surrounding the online encounter with the scammers to Ms. Meisel and Chief People Officer (CPO) Pamela Gage in separate meetings immediately after he concluded his meeting with Treaty Oak.

51. Plaintiff flew home to Austin, Texas that day, October 3, 2024.

***Defendants Fire Plaintiff***

52. Despite its representations to Plaintiff, UnitedLex did not investigate the incident for 60 days. Within two hours of arriving in Texas on October 4, 2024, UnitedLex terminated Plaintiff. CPO Pamela Gage delivered a termination letter via email to Plaintiff, claiming:

> Your employment is terminated under Section 6.1 of your Employment Agreement, specifically, under Sections 6.1(b)(v) and 6.1(b)(vii). If you want a written statement of the facts and circumstances that provide a basis for the termination, please contact Renee Meisel at renee.meisel@unitedlex.com.

(Exhibit B).

53. UnitedLex chose to terminate Plaintiff after only a one-day investigation. Investigators interviewed Plaintiff for half an hour without any additional follow-up or document requests. Moreover, a mere Google search of "Dads Against Predators" would have revealed to UnitedLex that DAP was a criminal, vigilante group who used its videos to extort victims. Plaintiff was a victim of DAP's extortionist scheme, and UnitedLex fired him for it.

54. Additionally, based on the provisions cited in the termination letter, UnitedLex purported to terminate Plaintiff for "violation or breach of this Agreement…or any other agreement between the Executive and the Company, the Partnership or any of their affiliates" (6.1(b)(v)) and for "grossly negligently engaging in conduct injurious to the Company, the Partnership or any of their affiliates" (6.1(b)(vii)).

55. After dealing with the surprise of his unlawful termination, Plaintiff emailed Ms. Meisel and requested the "facts and circumstances" surrounding his termination. Instead of responding with a written statement, Ms. Meisel requested a telephone conference "before putting anything in writing."

56. Despite the Employment Agreement requiring UnitedLex to provide a written statement of facts in any termination notice *and* Plaintiff's specific request for the statement, during the telephone call, Ms. Meisel inquired of Plaintiff: "What do you want to know?"

57. In violation of the Employment Agreement, UnitedLex failed to provide the written statement of facts and circumstances that provided a basis for his termination. According to the sections cited by the termination notice, Section 6.1, UnitedLex claimed to terminate Plaintiff "for cause."

58. Defendants terminated Plaintiff, the victim of a violent assault, without adequate investigation of the allegations against him. Absent an adequate investigation, Defendants did not have reliable support for any determination that he had violated or breached the Employment Agreement or any other agreement between him and the Defendants or any of their affiliates, or that he had "grossly negligently" engaged in conduct injurious to the Defendants or any of their affiliates.

59. Defendants terminated Claimant "without Cause."

60. Defendants breached the following sections of the Employment Agreement:

a. Section 5.3 by failing to grant 12,450 units of equity to Plaintiff;

b. Section 5.2 by failing to pay Plaintiff his annual bonus;

c. Section 6.2 by failing to pay Plaintiff his severance;

d. Section 6.4 by failing to provide adequate notice of termination;

e. Section 6(b) by directly or indirectly disparaging Plaintiff.

61. Those provisions were all part of the consideration that Plaintiff accepted in exchange for his employment and his return promises.

62. The Employment Agreement contains an arbitration agreement. Section 8 of the Employment Agreement states:

> Any dispute, controversy, or claim arising out of or related to this Agreement or any breach of this Agreement, other than the Company seeking equitable or injunctive relief described in Section 10, shall be submitted to and decided by binding arbitration held in Delaware. Arbitration shall be administered exclusively by American Arbitration Association and shall be conducted consistent with the rules, regulations, and requirements thereof as well as any requirements imposed by state law. Any arbitral award determination shall be final and binding upon the parties.

63. Pursuant to Section 8 of the Employment Agreement, Plaintiff has raised the following claims with the American Arbitration Association:

a. Count 1: Breach of Contract – Failure to Pay Annual Bonus;

b. Count 2: Breach of Contract – Failure to Pay Severance;

c. Count 3: Breach of Contract - Failure to Grant Equity Award;

d. Count 4: Breach of Contract – Failure to Provide Proper Notice;

e. Count 5: Breach of Contract – Violation of Non-Disparagement; and

f. Count 6: Breach of Implied Covenant of Good Faith and Fair Dealing.

***The False DAP Allegations are Spread***

64. Within days of the DAP assault, on or around October 11, 2024, the assailants posted the assault video online. The video was shared on several social media platforms, including Facebook, Instagram, YouTube, Reddit, Rumble, TikTok, X, WorldStar, Locals, and DAP's own website, among others. The reshared videos and their captions and titles were riddled with false accusations of Plaintiff being a pedophile.

65. Various captions included "PRED GETS HIT WITH A PUMPKIN SO HARD !!," "Child predator got knocked out with a pumpkin for trying to meet with a little boy," "Child

predator gets knocked out by a pumpkin," "Pred hit with Pumpkin for trying to meet with little child!!!," "Child Predator gets PUNCHED and then KNOCKED OUT with a pumpkin," and "James Gets Knocked Down with a Pumpkin."

66. Some videos individually amassed millions of views each. In total, across all social media platforms, the DAP assault video was viewed over 59,000,000 times.

***Defendants Defame Plaintiff***

67. After UnitedLex terminated Plaintiff and after the false DAP allegations against Plaintiff were shared online, UnitedLex and several executives defamed Plaintiff on social media.

68. On October 10, 2024, UnitedLex posted on its website that "Renee Meisel has been appointed Chief Executive Officer. Ms. Meisel, the company's General Counsel, replaces former CEO James Schellhase with immediate effect." The post further explained Meisel's qualifications to lead UnitedLex.

69. Yet, despite already announcing Meisel's replacement of Schellhase as CEO and only after DAP disseminated the video and false allegations online the day before, UnitedLex posted on LinkedIn and Twitter on or around October 12, 2024. UnitedLex, in a post titled "Company Statement," announced that "James Schellhase is no longer employed by UnitedLex. Upon learning information related to his personal conduct, UnitedLex promptly made the decision to terminate him as CEO on October 4, 2024."

70. At the time, around 186,000 accounts followed UnitedLex on LinkedIn.

71. Upon information and belief, at that time, a similar number of accounts followed UnitedLex on Twitter.

72. CPO Pamela Gage told vendors that Plaintiff was "fired for abhorrent personal behavior."

73. Moreover, the Chief Commercial Officer (CCO) told a marketing connection that she "couldn't believe he would work for [Plaintiff] after what he did and he should stop."

74. A "source inside UnitedLex with knowledge of the situation" told a journalist for LawNext.com that Plaintiff's termination had nothing to do with Plaintiff's "work there or any sort of corporate or employment-related malfeasance," implying Plaintiff's termination was because of the DAP allegations.

75. Many articles and posts circulated online discussing Schellhase's termination, including a Law360 article titled, "UnitedLex Says Ex-CEO Terminated For 'Personal Conduct'" and an AboveTheLaw article titled, "UnitedLex CEO's Sudden Departure Appears To Be Due To Personal Allegations Unrelated To Work."

76. Many articles cited the DAP video as the "personal conduct" that caused Defendants to terminate Plaintiff.

77. Plaintiff has been searching for another job but has not yet found one.

78. The six-time CEO with a strong record of success is now unemployable because UnitedLex recklessly destroyed his professional reputation by defaming him to hundreds of thousands of stakeholders.

79. Plaintiff was the victim of a setup, assault, and extortion scheme.

80. Defendants blamed the Plaintiff for his victimization and then made him the scapegoat for the bad publicity.

81. In doing so, Defendants' defamatory campaign destroyed Plaintiff's professional reputation, which has resulted in loss of income, earning capacity, and business opportunities. Plaintiff has also suffered severe emotional distress because of the defamation and false light invasion of his privacy.

## COUNT ONE – DEFAMATION

82. Plaintiff incorporates herein by reference the allegations made in the paragraphs above as if fully rewritten.

83. As described above, Defendants, by themselves, and through their agents made several disparaging statements of and concerning Plaintiff, which they published to third parties. Those statements include:

a. Defendant UnitedLex posting on LinkedIn and Twitter in a post titled "Company Statement," that "James Schellhase is no longer employed by UnitedLex. Upon learning information related to his personal conduct, UnitedLex promptly made the decision to terminate him as CEO on October 4, 2024," published to approximately 186,000 followers on each platform.

b. Defendant UnitedLex's Chief People Officer posting on LinkedIn and stating to third parties that Plaintiff was terminated for engaging in "abhorrent personal behavior"

c. Defendant UnitedLex's Chief Commercial Officer telling business connections that she "couldn't believe he would work for [Plaintiff] after what he did and he should stop."

d. Upon information and belief, Defendants and Defendants' agents made other disparaging statements falsely accusing Plaintiff of committing the misconduct alleged in the DAP posts and videos.

84. Defendant UnitedLex did not test the DAP allegations before publishing. Defendant UnitedLex announced a 60-day investigation, conducted a single interview of approximately twenty-five minutes, and terminated Plaintiff the following afternoon. The

statements it then published validated the DAP's false allegations, and in doing so lent those allegations the credibility of Plaintiff's own employer.

85. Defendant UnitedLex's decision to release the above statements to the general public disparaged Plaintiff. In particular, the use of the word "promptly" is unusual and conveys a sense of urgent change in leadership that is atypical in a corporate setting and especially unusual here given Plaintiff's successful and praised leadership as UnitedLex's CEO.

86. Defendant UnitedLex's decision to link Plaintiff's "prompt" termination to his "personal conduct" creates a clear implication that Defendant UnitedLex believed he did something terrible that was unrelated to his leadership of the company.

87. Defendant UnitedLex's decision to post the Company Statement on the internet to approximately 186,000 followers is especially problematic and disparaging given the company's word choice combined with DAP's assault and release on the internet of videos of the assault containing false accusations.

88. The above disparaging statements, when viewed in context of the surrounding circumstances, including the widespread false DAP allegations, accuse Plaintiff of being a pedophile and attempting to meet up with minor boys and they amplify the false DAP allegations.

89. The above disparaging statements, when viewed in context of the surrounding circumstances, including the widespread false DAP allegations, are defamatory per se because the statements impute a crime or unethical conduct to Plaintiff and malign Plaintiff in his trade, business, and profession.

90. The above disparaging statements are reasonably understood to be statements of fact about Plaintiff and were understood by the people who saw, heard, or read them to be statements of fact about Plaintiff.

91. The above disparaging statements, in light of the surrounding circumstances, are false.

92. Defendants had no applicable privilege or legal authorization to make the above-described false statements, but even if they did, they abused any privilege and legal authorization.

93. Defendants made the above-described statements with actual malice because Defendants had knowledge of the falsity of their statements or recklessly disregarded the truth of their statements. Defendants intentionally disregarded the findings of any investigation or failed to conduct a meaningful investigation to ascertain the truth or falsity of their statements or the DAP allegations.

94. Because of Defendants' defamatory statements against Plaintiff, Plaintiff has suffered severe economic and non-economic harm.

## COUNT TWO – FALSE LIGHT

95. Plaintiff incorporates herein by reference the allegations made in the paragraphs above as if fully rewritten.

96. As described above, Defendants, by themselves, and through their agents made several false and misleading statements of and concerning Plaintiff, which they published to third parties. Those statements include:

a. Defendant UnitedLex posting on LinkedIn and Twitter in a post titled "Company Statement," that "James Schellhase is no longer employed by UnitedLex. Upon learning information related to his personal conduct, UnitedLex promptly made the decision to terminate him as CEO on October 4, 2024," published to approximately 186,000 followers on each platform.

b. Defendant UnitedLex's Chief People Officer stating to third parties that Plaintiff was terminated for engaging in "abhorrent personal behavior"

c. Defendant UnitedLex's Chief Commercial Officer telling business connections that she "couldn't believe he would work for [Plaintiff] after what he did and he should stop."

d. Upon information and belief, Defendants and Defendants' agents made other false and misleading statements falsely accusing Plaintiff of committing the misconduct alleged in the DAP posts and videos.

97. The above statements, when viewed in context of the surrounding circumstances, including the widespread false DAP allegations, place Plaintiff in a false light and accuse Plaintiff of being a pedophile and attempting to meet up with minor boys and they amplify the false DAP allegations.

98. The above statements, when viewed in context of the surrounding circumstances, including the widespread false DAP allegations, are highly offensive to Plaintiff and would be highly offensive to a reasonable person.

99. The above statements are reasonably understood to be statements of fact about Plaintiff and were understood by the people who saw, heard, or read them to be statements of fact about Plaintiff.

100. The above statements, in light of the surrounding circumstances, are false.

101. Defendants had no applicable privilege or legal authorization to make the false statements above, but even if they did, they abused any privilege and legal authorization.

102. Defendants made the above-described statements with actual malice because Defendants had knowledge of the falsity of their statements or recklessly disregarded the truth of

their statements. Defendants intentionally disregarded the findings of any investigation or failed to conduct a thorough investigation to ascertain the truth or falsity of their statements or the DAP allegations.

103. Because of Defendants' false and misleading statements against Plaintiff, Plaintiff has suffered severe economic and non-economic harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands, on all counts, judgment and relief against Defendants as follows:

A. Compensatory damages in an amount not less than $75,000 for economic, emotional, reputational and other harm;

B. Pre- and post-judgment interest;

C. Punitive damages;

D. For costs of this suit; and

E. For such other relief as may be available at law or in equity, including, without limitation, reimbursement of all costs and expenses incurred by Plaintiff in connection with this action, including, without limitation, reasonable attorneys' fees.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a jury trial on all issues and questions raised in this complaint by the maximum number of jurors permitted by law.

Dated: October 12, 2026

/s/ David L. Finger
David L. Finger (#2556)
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com
Attorney for Plaintiff James Schellhase

OF COUNSEL:

Christopher Joyce, Esq.
Flannery | Georgalis LLC
1621 Euclid Avenue
Keith Building, Floor 16
Cleveland, OH 44115
(216) 367-2120